UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_______________________________________________X
QoS NETWORKS LIMITED, LAWRENCE DANIEL O'NEILL, JAMES VALENTINE and MICHAEL KEANE,

Plaintiffs,

-against-

COMPLAINT

WARBURG PINCUS & COMPANY, WARBURG PINCUS LLC, E.M. WARBURG, PINCUS & CO., INC., WARBURG, PINCUS EQUITYPARTNERS, L.P., WARBURG, PINCUS NETHERLANDS EQUITY PARTNERS I, C.V., WARBURG, PINCUS NETHERLANDS EQUITY PARTNERS II, C.V., WARBURG, PINCUS NETHERLANDS EQUITY PARTNERS III, C.V., ROBERTO ITALIA and ROBERT GLANVILLE,

07 Civ. 2744 (PKL)

**JURY TRIAL DEMANDED**

Defendants.
_______________________________________________X

Plaintiffs, by their attorney, William A. Thomas, respectfully allege on information and belief:

Parties, Jurisdiction and Venue

1. Plaintiff QoS NETWORKS LIMITED ("QoS") was at all relevant times an Irish corporation engaged in the business of telecommunications with its principal place of business in Dublin, Ireland and with substantial business operations in the United States.

2. Plaintiff LAWRENCE DANIEL O'NEILL ("O'NEILL") is and at all times relative hereto was an individual residing at 7 Longford Terrace, Monkstown, County Dublin, Ireland. At all relevant times herein O'Neill was a minority shareholder of QoS. Plaintiff O'NEILL was, in addition to owning approximately 2 % of the ordinary and preferred shares and

subordinated loan notes of QoS, a member of the Board of Directors in QoS and its Chairman of the Board of Directors.

3. Plaintiff JAMES VALENTINE ("VALENTINE") is and at all times relative hereto was an individual residing at 4903 Edgemoore Lane, Apt. 703, Bethesda, Maryland 20814. At all relevant times herein, Valentine was a minority shareholder of QoS. Plaintiff VALENTINE was, in addition to owning approximately 2.5 % of the ordinary and preferred shares and subordinated loan notes of QoS, a member of the Board of Directors and the Chief Executive Officer and President of QoS.

4. Plaintiff MICHAEL DAVID KEANE ("KEANE") is and at all times relative hereto was an individual residing at Wittenham House, Little Wittenham, Abingdon, Oxon OX14 4RA. At all relevant times herein, Keane was a minority shareholder of QoS. Plaintiff KEANE was, in addition to owning approximately 2.5 % of the ordinary and preferred shares and subordinated loan notes of QoS, a member of the Board of Directors in the company and its Chief Financial Officer.

5. The respective claims of Plaintiffs arise from substantially the same transactions and occurrences, involve substantially identical legal and factual issues, and are properly joined in this action.

6. Defendant WARBURG PINCUS & CO. ("Warburg") is an entity maintaining an office in this district, that is, within the City, County and State of New York, with places of business at 466 Lexington Avenue and 335 Madison Avenue.

7. Defendant WARBURG PINCUS LLC ("Warburg Pincus LLC") is a New York Limited Liability Company also maintaining an office in New York City and believed to be the successor entity to defendant E.M. Warburg, Pincus & Co., Inc.

8. Defendant E.M. WARBURG, PINCUS & CO., INC. ("E.M. Warburg") is a Delaware corporation also maintaining an office in New York City and succeeded by and/or sometimes transacting as Warburg Pincus LLC. Warburg, Warburg Pincus LLC and E.M. Warburg are at times referred to herein severally and collectively as the "Warburg Defendants."

9. Defendants WARBURG, PINCUS EQUITY PARTNERS, L.P. ("Warburg Equity") (a Delaware limited partnership), WARBURG, PINCUS NETHERLANDS EQUITY PARTNERS I, C.V. ("Netherlands I"), WARBURG, PINCUS NETHERLANDS EQUITY PARTNERS II, C.V. ("Netherlands II"), and WARBURG, PINCUS NETHERLANDS EQUITY PARTNERS III, C.V. ("Netherlands III") (said Defendants being sometimes referred to herein severally and collectively as the "Warburg Funds")are entities the general partner of which is Defendant Warburg and/or Warburg Pincus LLC. The Warburg Funds, by and through their general partner, are regularly doing business in New York and/or have transacted business within New York from which the subject allegations arise, have committed tortious conduct in the State of New York, and/or have committed tortious conduct outside the State of New York resulting in injury within the State of New York

10. The acts and omissions of Warburg and Warburg Pincus LLC described herein were on its own behalf and on behalf of E.M. Warburg and the Warburg Funds.

11. Defendant ROBERTO ITALIA ("Italia") is a citizen and domiciliary of Italy, with a residence at Via Pisanelli #440, Rome 00196, is regularly doing business in New York and/or has transacted business within the State of New York from which the subject allegations

arise, and/or has committed tortious conduct in the State of New York, and/or has committed tortious conduct outside the State of New York resulting in injury within the State of New York.

12. Defendant ROBERT GLANVILLE ("Glanville") is a resident of the State of Connecticut with a residence at 12 Doubling Road, Greenwich, CT 06830, is regularly doing business in New York and/or has transacted business within the State of New York from which the subject allegations arise, and/or committed tortious conduct in the State of New York, and/or has committed tortious conduct outside the State of New York resulting in injury within the State of New York.

13. The Plaintiffs' claims arise from Defendants' contacts with, transactions of business and/or tortious conduct within, the State of New York, and/or Defendants' tortious conduct outside the State of New York resulting in injury within the State of New York.

14. Defendants have conspired and acted in concert to carry out an illicit scheme to tortiously interfere with and damage Plaintiffs' property rights, and to defraud Plaintiffs.

15. Defendants are joint tortfeasors and are jointly and severally liable to each of the Plaintiffs.

16. Diversity jurisdiction lies pursuant to 28 U.S.C. § 1332 (a) insofar as the amount in controversy exceeds $75,000 and there is complete diversity of citizenship between plaintiffs and defendants, to wit: Plaintiffs QOS and O'Neill are citizens of Ireland, plaintiff Valentine is a citizen of the State of Maryland, and plaintiff Keane is a citizen of the United Kingdom; defendants Warburg Pincus & Company and Warburg Pincus LLC are on information and belief citizens of the State of New York; defendants E.M. Warburg, Pincus & Co., Inc. and Warburg, Pincus Equity Partners, L.P. are citizens of the State of Delaware; the remaining "Warburg Fund" defendants are on information and belief citizens of the Netherlands and/or the

Netherlands Antilles; defendant Italia is a citizen of Italy; and defendant Glanville is a citizen of the State of Connecticut.

18. Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) and/or (3).

## FACTUAL BACKGROUND

19. After considerable negotiations, in or about February 2000, Defendant Warburg issued a term sheet setting forth its intention to invest $53,000,000 in QoS, with an initial investment of $30,000,000. Upon information and belief, Defendant Warburg is controlled by and acts at the direction of Defendant E.M. Warburg, and the Warburg Defendants manage and control the Warburg Funds.

20. On or about April 14, 2000, QoS closed its first round of financing with the Warburg Defendants and the Warburg Funds, in which the Warburg Funds directly invested $15,000,000 out of an approximate $30,000,000 in funding, with a second tranche to be made by June 2000 (hereinafter the "First Closing"). Pursuant to that investment, various Warburg Entities became, in the aggregate, the largest shareholder of QoS.

21. Pursuant to a Shareholder Agreement executed at the First Closing, the Board of Directors of QoS was to consist of the following: L. Daniel O'Neill ("O'Neill") as Chairman, James Valentine ("Valentine"), Michael Keane ("Keane"), James Beaumont Hendrickson ("Hendrickson"), and two directors to be appointed by Warburg. The initial directors appointed by Warburg were one James Thomas and Defendant Glanville. Any Board action required a majority vote, and a majority vote was defined so as to require at least one Warburg-appointed director to vote with the majority. Therefore, there could be no Board action without the

affirmative vote of at least one Warburg-appointed director. In addition to being one of the initial directors, Hendrickson also became an executive officer on or about April 14, 2000.

22. On May 3, 2000, QoS closed a second round of financing for approximately $4,500,000 (the "Second Closing"). On that same date QoS adopted its Amended Articles of Association, and James Thomas resigned and was replaced as a Warburg-appointed director by Defendant Italia, thereby making Defendants Glanville and Italia the two Warburg-appointed directors on the QoS Board of Directors.

23. From the outset of preliminary negotiations, through the term sheet, First Closing and Second Closing, and thereafter until April 5, 2001, one of the primary factors in the company's business plan (and its decisions made in accordance with that business plan) was the stated intent of Warburg to "follow its money" by causing the Warburg Funds and Warburg Defendants to make further investments in QoS. QoS and others reasonably and detrimentally relied on this repeated representation by Warburg (which was made by Warburg on its own behalf and on behalf of E.M. Warburg and the Warburg Funds).

24. Warburg and its appointed directors, Glanville and Italia, took an active "hands on" role in the management and business decisions of QoS. In November and December 2000, certain executives with QoS determined that certain changes in some of the management personnel should be made, but Warburg exercised undue influence to prevent those management changes, indicating that for Warburg to "follow its money" things had to be done as Warburg directed. By December 2000, it had become apparent that Hendrickson was not performing his duties as an executive officer or director, and Hendrickson consistently misled other senior management regarding the performance and implementation of the QoS business plan.

Notwithstanding this fact, Warburg, through the Warburg-appointed directors, continued to support Hendrickson, and discouraged any negative comments about Hendrickson.

25. Throughout this period Warburg consistently gave direction as to budget, personnel and management issues, stating that such dictates were necessary for Warburg to provide additional funding to or for QoS. As a result, QoS complied with such dictates.

26. On January 26, 2001, James Valentine, Chief Executive Officer of QoS, gave written notice to Hendrickson that QoS could terminate Hendrickson's employment "for cause" unless Hendrickson's performance materially improved. In said letter, Hendrickson was given accurate notice that Hendrickson's reports had been false and misleading, that he had furtively entered into unduly onerous contracts that exceeded his authority and that the QoS employees had become demoralized as a result of Hendrickson's actions. Notwithstanding this notice, Hendrickson did not correct these shortcomings. Efforts to bring these problems before the Board for remedial action were thwarted by the Warburg-appointed directors.

27. Hendrickson, assisted by one Bernard Reagan ("Reagan"), made false and misleading reports regarding the development and implementation of the QoS network (which was key to the success of the QoS business plan), and in entering into an unfavorable contract without authorization.

28. In addition to frequent board meetings, there were also many management meetings in which Warburg, through its Warburg-appointed directors, participated. In virtually all these meetings, Warburg reiterated its commitment to provide additional funding. At Warburg's insistence, all funding efforts by QoS were based upon the premise that Warburg would be participating in any funding of QoS. Warburg made these commitments not only to QoS management, but to potential lenders or investors as well.

29. In mid-February 2001, as a result of Hendrickson's failure to correct any of his deficiencies in management, Valentine asked Hendrickson to resign as the QoS Chief Operating Officer and move to a role in product development and strategy. Hendrickson agreed, and QoS began a search for a new Chief Operating Officer. On or about February 28, 2001, Valentine informed Defendant Glanville that Hendrickson had agreed to be replaced as the Company's Chief Operating Officer, and discussed possible replacements for Hendrickson in that role. Notwithstanding these developments, Warburg, through its Warburg-appointed directors (primarily Glanville), communicated privately with Hendrickson, encouraging him to remain Chief Operating Officer, and even suggesting that he might become president (replacing Valentine). None of this was disclosed to Valentine, Keane or O'Neill (the other directors).

30. On March 13, 2001, Warburg, Italia and Glanville approved the new budget and reduced staff of QoS, which was to be announced at a company-wide meeting to take place in Atlanta, Georgia on March 28, 2001.

31. Defendants devised a plan or scheme to remove Messrs. Valentine, Keane and O'Neill, all of whom were executive officers and founders of QoS, from office, and to make Hendrickson president, and to give Reagan increased responsibilities and authority as well. This plan was concealed from Valentine, O'Neill and Keane despite the fact that they were members of the QoS Board of directors. Without telling said Directors, and without Board approval, Defendants began attempting to elicit support among the rank and file personnel of QoS, representing that such change was necessary in order for Warburg to provide additional funding for the Company, and further representing that without such funding from Warburg, no one else would be willing to provide funding for QoS.

32. At the direction of Glanville, the format and substance of the March 28, 2001 meeting was changed.

33. Warburg, through Glanville, devised a “proof of concept,” and represented that if said “proof of concept” could be achieved Warburg would support all necessary funding by matching all other funding on a dollar-for-dollar basis, but indicated that this was conditioned upon Valentine, O’Neill and Keane being removed from all management and operational responsibilities (other than assisting in other fundraising efforts).

34. By giving inconsistent messages to the employees of the Company, and by secretly causing turmoil within management, Defendants seriously and intentionally disrupted the business operations of QoS.

35. In the evening of March 28, 2001, in a meeting in which Glanville, Valentine, Keane and Hendrickson participated, Glanville stated that Warburg had determined that there must be substantial changes in QoS management for Warburg to provide further funding, and that one of the conditions was that Valentine, O’Neill and Keane resign as executives and step down from active management in the Company. Glanville supported Hendrickson as new president of QoS. Valentine asked Glanville if he had checked to see how the various company managers would react to Hendrickson becoming CEO, and Glanville assured Valentine and the others present that he had inquired of the company managers, and had gotten their support for the idea. This was false, Glanville knew it to be false when he made the statement, and he made the statement with the intent to deceive, in order to get said executives to resign.

36. When this intention was announced, most of the managers rebelled at the idea of Hendrickson becoming president, so Warburg, through Glanville dictated that the various managers meet together and vote on who should become president, all the while making it clear

that future funding of QoS by Warburg depended on the vote. Since most of the managers rejected Hendrickson as president, Glanville "created" a co-presidency with Hendrickson and one Gareth Williams to be the co-presidents. This created an untenable situation, and added to the chaos already created by Warburg, its Warburg-appointed Directors and Hendrickson.

38. On March 30, 2001, a majority of the managers agreed that Hendrickson should not be president or Chief Operating Officer, and that Gareth Williams should be the sole president of the Company. The management team then agreed to hold company-wide meetings on April 2 and 3, 2001.

39. On March 30 and 31, 2001, Messrs. Keane and Valentine voiced (via telephone and e-mail) their objection to the outrageous conduct on the part of Warburg and its designees.

40. When the April 2-3, 2001 meeting commenced, Defendant Glanville arrived with a representative of Internap Network Services Corp. ("INAP"), stating that the purpose for the INAP representative's presence was to explore a potential collaboration with QoS. No prior notice of this concept or "potential" was given to the Board of Directors of QoS, and QoS was never provided with any details of the contemplated collaboration.

41. Glanville continued his unwarranted denigrating comments about Valentine, O'Neil and Keane, in a deliberate attempt to undermine employee confidence in their management.

42. On April 4, 2001, Defendant Glanville issued an e-mail revising and more particularly defining his "proof of concept," and continued to represent that Warburg would provide additional funding to QoS (including statements of active support at the reconvened "all hands" meeting). Then, at the April 5, 2001 Board of Directors Meeting, Italia and Glanville announced that Warburg would not participate in any further funding. Without prior notice to

Valentine, Keane or O'Neill, Glanville and Italia brought with them in-house counsel for Warburg who represented Warburg at the QoS Board of Directors meeting. Glanville, Italia and Warburg urged management to consider liquidating QoS immediately.

43. QoS management (other than Defendants) determined that it was more prudent not to liquidate or wind up the affairs of QoS, but that it would be more appropriate to approach potential investors for funding through a stock rights offering, in order to salvage the enterprise value of the company and continue its operations in accordance with the business plan (which projected significant profits). Warburg voiced its opposition to any such rights offering from the outset.

44. At the April 11, 2001 Board of Directors meeting, Italia and Glanville informed the Board that since Warburg would not be providing financing, any continued operation and funding would require a restructuring of the company, and that they (Italia and Glanville) would not make any further decisions with respect to the financing and operations of the Company without first reviewing a proposed restructuring plan. Since a majority vote required at least one of their votes, the ability of QoS to act was further hindered.

45. On April 13, 2001, Valentine delivered a letter to Hendrickson terminating his employment for cause. On or about the same day, QoS terminated Reagan's employment as well. On April 17, 2001, despite having been terminated for cause, Hendrickson submitted a purported letter of resignation, purportedly becoming effective May 31, 2001.

46. At the May 3, 2001 Board of Directors meeting, Keane presented the terms of a proposed stock rights offering to be offered to existing shareholders (the "Rights Offering"). The Rights Offering called for a capital restructuring of the Company. Warburg opposed the terms of the Rights Offering and refused to suggest or propose any alternative. Italia and

Glanville refused to vote on the issue. Glanville and Italia also refused to sign the minutes from the previous Board of Directors meeting. Their actions were calculated to obstruct all constructive action by QoS so as to force QoS into insolvency and liquidation.

47. During a Board of Directors meeting on May 7, 2001, Italia and Glanville delivered a letter of resignation. At the same meeting, Warburg delivered a letter waiving its right to require at least one Warburg director to approve any Board of Directors action, although expressly reserving the right to withdraw that waiver at any time, thereby making it clear to QoS that Warburg intended to continue efforts to control and unduly influence the Board.

48. QoS continued to pursue the Rights Offering, and obtained commitments from other stockholders of QoS to fund $10,000,000, but Warburg refused to even negotiate on the matter.

49. On August 3, 2001, after delays caused by Warburg, an emergency general meeting of QoS was held for the express purpose of voting on the Rights Offering. Warburg (and its controlled entities) and Hendrickson were the only stockholders to vote against the Rights Offering, despite the fact that it provided a means by which QoS could survive and prosper, and that the only alternative to the Rights Offering was insolvency and cessation of operations (which, in turn, would result in extraordinary damage to the stockholders, employees and creditors of QoS).

50. There was no legitimate basis for Warburg or Hendrickson to oppose the Rights Offering, and their vote against the Rights Offering was contrary to the best interests of QoS, and contrary to their duty to the company. Defendants Warburg, Italia, Glanville and Hendrickson had relationships of confidence with QoS, and therefore owed QoS a strict fiduciary duty.

51. Hendrickson and Reagan destroyed or attempted to destroy records in an effort to cover up the conspiracy among the Defendants.

52. In the initial funding of the Plaintiff QoS, the Warburg Defendants intentionally undercapitalized QoS with the intent that QoS would have further capital requirements before it was able to fully implement the business plan upon which Warburg based its investment in QoS. This intentional undercapitalization was coupled with promises by the Warburg Defendants and Defendant Glanville (and subsequently the Defendant Italia as well) that Warburg would provide the necessary additional capital when and as the need arose. This induced the founders to accept Warburg's proposal, and induced the founders and other investors to invest in QoS in conjunction with the initial funding by Warburg, which occurred primarily through 2 tranches.

53. Warburg intentionally undercapitalized QoS so as to enable it to extract further concessions from other shareholders and management when the anticipated additional capital needs arose, thereby giving Warburg even more control over QoS Management, operations, financing and business decisions, and to enable Warburg to gain an even greater interest in QoS at the expense of other stockholders by eliminating or greatly reducing QoS's bargaining position.

54. At the same time it was entering into the agreement to fund QoS, Warburg insisted that the QoS founders (L. Daniel O'Neill, James Isaac Valentine, Michael Keane and James Hendrickson) also invest in the venture. O'Neill, Valentine and Keane were required to invest $1,000,000 each, and Warburg offered to loan a portion of that investment to each of them, taking back a purported debt facility in favor of one of the Warburg Defendants. Warburg did this in order to gain further influence over the founders, who would also be board members and executive officers of QoS.

55. Warburg also required, as a condition to the funding of QoS, that it be allowed to designate two(2) board members of QoS; and further required that in order for any vote by the members of the board of directors to be deemed a majority vote, at least one of the Warburg designees, i.e., Defendants Glanville and Italia (sometimes referred to herein as the "Warburg Designees") must vote for the proposition or action under consideration. Therefore, there could be no action by the QoS board without the consent of at least one of the Warburg Designees (both of whom were always controlled by Warburg).

56. Despite the fact that the Warburg Designees were employees of Warburg, once they accepted the positions as QoS board members, they owed to QoS a strict fiduciary duty of loyalty, good faith, diligence and fair dealing. This duty required them to exercise their independent reasonable business judgment for the benefit of QoS free from any self interest and free from any favoritism or bias in favor of Warburg. At all times pertinent hereto, the Warburg Defendants exercised control over the Warburg Designees and the Warburg Designees acted in the best interest of Warburg rather than in the best interest of QoS. Contrary to their duty to QoS, the Warburg Designees were loyal to Warburg, not QoS. When Hendrickson joined the conspiracy, he too violated his duty of loyalty to QoS by giving his loyalty to Warburg.

57. Through their influence on the board and management, and their repeated assurances of additional funding, Warburg and the Warburg Designees caused QoS to adopt aggressive business strategies and tactics that called for rapid expansion and acquisition of assets, rapid and expanded development of products and and expansive infrastructure, considerable public relations and promotional activities, and the hiring of a large number of employees, as well as retaining a number of independent contractors. This resulted in an accelerated rate of cash expenditures, causing the cash available to the already undercapitalized

company to be further depleted, and more rapidly than initially contemplated by the founders. This was done in conjunction with repeated assurances by Warburg and the Warburg Designees that Warburg would provide additional capital to fund the capital needs of QoS. But for those repeated assurances of additional funding, O'Neill, Valentine and Keane would have resisted such aggressive strategies until appropriate funding was obtained.

58. The Warburg Designees, at the direction of Warburg, took an active role in the operations and business decisions of QoS Management, and this was particularly true of the Defendant Glanville, who continually communicated directly with QoS personnel rather than through the executive officers of QoS. His hands-on actions and exertion of influence, aided by the efforts of Hendrickson, caused a general view among many of the employees of QoS that Glanville was their boss. This was intended to, and in fact did, undermine the confidence in O'Neill, Valentine and Keane, among other QoS personnel.

59. Warburg and the Warburg Designees, with the willing assistance of Hendrickson, caused QoS resources and personnel to be used to investigate business and investment opportunities for the benefit of Warburg, thereby further depleting the resources of QoS, and delaying the implementation of the QoS business plan. This, in turn, delayed the ability of QoS to generate revenues. All of this was calculated by the Defendants to benefit them, while putting QoS in a position of extreme economic duress, so as to better enable Defendants to exert undue influence over QoS and its management.

60. Warburg and the Warburg Designees obtained the assistance of the Hendrickson in their scheme to misuse the QoS resources, place it in a position of undue economic duress, and thereby gain further control and benefits of the company by leading him to believe they would elevate him to president of QoS. This included a scheme to remove O'Neill, Valentine

and Keane, as Warburg correctly discerned they were not so compliant with Warburg's self-serving wishes as was Hendrickson.

61. The Warburg Defendants, the Warburg Designees and Hendrickson conspired to misappropriate QoS resources (including the labor and time of its personnel) for the benefit of Warburg, to otherwise waste the assets of QoS, to make unreasonable expenditures (in reliance on Warburg's bad faith assurances of additional funding), to put QoS in an unreasonable risk of insolvency, and to exercise undue influence over the remaining management of QoS in order to benefit the Defendants contrary to the best interest of QoS.

62. Pursuant to the conspiracy, and at the bidding of Warburg and the Warburg Designees, Hendrickson himself personally engaged in analysis and due diligence of various companies and business opportunities for the benefit of Warburg, and also caused other QoS staff to do the same. Hendrickson concealed the true nature of these activities from the other non-Warburg board members, O'Neill, Valentine and Keane, who were also executive officers of the company.

63. Warburg and the Warburg Designees encouraged QoS to hire new personnel in order to expedite the implementation of the business plan, and to develop a business development and sales force, all on the basis of Warburg's repeated assurances of additional funding. In conjunction with that encouragement, and in furtherance of their conspiracy, Warburg, the Warburg Designees and Hendrickson all assured QoS that Warburg would provide the necessary additional funding.

64. During this period the Warburg Defendants, the Warburg Designees and Hendrickson met to discuss plans to remove the other non-Warburg directors, and to install

Hendrickson as president. These meetings and discussions were concealed from the other non-Warburg directors.

65. In late March, 2001 the Defendants openly took steps to improperly remove O'Neill, Valentine and Keane, and to make Hendrickson president. In order to gain acquiescence from O'Neill, Valentine and Keane, Warburg gave the ultimatum that if they did not voluntarily step aside, then Warburg would renege on its commitment to provide funding. They all 3 agreed to step aside, but cautioned Warburg against elevating Hendrickson to president, because of the disruption that would cause among management and other personnel at QoS. Notwithstanding this cautionary advice, Warburg, through Defendant Glanville, unilaterally appointed Hendrickson president. Glanville falsely stated that he had consulted with all senior management, and that they had agreed, when in fact he had not consulted with most of the key senior management. Upon learning of this move, most senior management resisted, and complained that Hendrickson could not run the company. Thereafter Glanville established a co-presidency of QoS (with Hendrickson and one Gareth Williams being the co-presidents), which also proved inefficient, divisive and disruptive, so he then called a number of managers into a meeting, and directed them to vote on whether Hendrickson or Gareth Williams would be president of the company. All of this caused a great deal of confusion and turmoil within the company. When Williams was "elected," the Defendants were not supportive, thereby causing further confusion and disruption of business operations, all to the detriment of QoS, its stockholders and its creditors.

66. Shortly thereafter Warburg stated that it would not fund the company any further, and the Defendants then took steps to block the company's efforts to obtain alternative financing, thereby assuring the company's insolvency.

67. The Defendants' conduct, which included breaches of their fiduciary duties, and their duties of care, and also included fraudulent misrepresentations and material concealments, initially placed QoS at unreasonable risk of insolvency, and actually thereafter caused such insolvency. Even after QoS found itself, as a result of Defendants' actions, in the vicinity of insolvency, Defendants continued their pattern of breaches of duty and misconduct, all in furtherance of their conspiracy.

68. As a result of the Defendants' forcing QoS into the vicinity of insolvency or impending insolvency, the Defendants also owed a fiduciary or duty of care to the creditors of QoS. The Defendants' continued misfeasance and malfeasance in the face of impending insolvency breached their duty to creditors of QoS.

69. The misfeasance and malfeasance ultimately drove QoS into insolvency, forcing it to seek relief through examination proceedings in Ireland (roughly analogous to Chapter 11 bankruptcy proceedings in the United States). The Irish High Court approved QoS' plan of reorganization (termed a Scheme of Arrangement under Irish law, and those proceedings have been successfully concluded.

70. Through their illicit conspiracy and the wrongdoing in furtherance thereof, the Defendants have substantially destroyed the corporate enterprise and its enterprise value, and have destroyed the substantial good will the company had developed. The Defendants caused the corporation to lose its market window of opportunity while its products were on the cutting edge of technology and uniquely situated to satisfy market needs, and also caused the corporation to be unable to maintain product enhancement and improvement in order to keep pace with changing market and industry conditions, thereby causing Plaintiff QoS substantial damage for which it is entitled to a joint and several recovery from Defendants.

COUNT I

QOS CLAIM FOR PROMISSORY ESTOPPEL

71. The allegations of all enumerated paragraphs above are hereby incorporated into this COUNT I as fully and completely as if set out at length herein.

72. Defendants Warburg, Italia and Glanville repeatedly made promises of funding (even after the initial subscription and shareholders agreement that were signed at the first closing and the second closing) in order to induce certain actions on the part of QoS and its management. These promises were coupled by the statement (sometimes express, sometimes implied) that no funding would come from Warburg unless Warburg's wishes were carried out. As a result of these promises and statements, QoS reasonably relied thereon to its detriment. These promises and statements were made on behalf of the Warburg Defendants and the Warburg Funds.

73. As a result of such detrimental reliance, QoS refrained from making prudent management changes, made imprudent management changes, altered budgets and staffing, and restricted the manner in which it attempted to raise funds. The QoS business plan and the manner of implementation thereof were based on Warburg's promises, and QoS' reliance thereon.

74. In reliance upon Warburg's representations, QoS joined with Warburg in representing Warburg's commitment to participate in funding. These representations were made to financial institutions, investment bankers, employees, prospective employees, customers, prospective customers, suppliers, prospective suppliers and the business community in general.

Notwithstanding these promises and assurances, and the resulting reliance thereon, Warburg reneged on its commitments.

75. As a result of the detrimental reliance, the Warburg Defendants and the Warburg Funds became obligated to provide such funding. By failing to fund as promised, and by wrongfully concealing its true intentions, the Warburg Defendants and the Warburg Funds caused QoS to lose all or substantially all of enterprise value, which was worth, at the time of the April 5, 2001 announcement of Warburg's withdrawal of support, approximately $150,000,000.

76. Warburg primarily made these promises, assurances and commitments through Glanville and Italia. Furthermore, Glanville and Italia participated in Warburg's concealment of material facts. As a result of such promissory estoppel, duress and wrongful concealments, the Plaintiff QoS has suffered damage of $150,000,000, or such other amount as is shown by appropriate evidence upon the trial of this case. The Warburg Defendants, the Warburg Funds, Italia and Glanville are jointly and severally liable to QoS therefor.

## COUNT II

## QOS CLAIM FOR BREACH OF FIDUCIARY DUTY

77. The allegations of all enumerated paragraphs above are hereby incorporated into this COUNT II as fully and completely as if set out at length herein.

78. The Warburg Defendants, the Warburg Funds, Italia, and Glanville had relationships of confidence with QoS. Accordingly, they owed QoS a strict fiduciary duty.

79. Defendants Italia and Glanville were Directors of QoS, and therefore owed QoS a statutory fiduciary duty.

80. The Warburg Defendants and the Warburg Funds, through their power to appoint and control directors, and their active manipulation and control of those appointees, were effectively a "shadow director" or *de facto* director, and, as such, owed QoS a strict fiduciary duty.

81. As a result of the control and influence said Defendants had over QoS, the law imposed upon them a law of heightened duty to act in the best interest of QoS.

82. Said Defendants repeatedly and willfully breached their fiduciary duty.

83. Reagan knowingly aided and abetted said breaches by the other Defendants by engaging in conduct contrary to the duties imposed upon him as Chief Information Officer of QoS, and which were knowingly contrary to the best interest of the Company. As a result of the numerous breaches of fiduciary duty, and the concerted action of Defendants with respect thereto, the Plaintiff QoS lost all or substantially all its enterprise value and was forced to cease operations.

84. In early April 2001, when these breaches by Defendants culminated in an extraordinary breakdown in management of the Company, the fair value of QoS was approximately $150,000,000.

85. Notwithstanding the damage caused by Defendants, QoS diligently attempted to mitigate damages and salvage its business plan and enterprise value. QoS obtained commitments for $10,000,000 of additional funding, but Warburg, with the assistance of the other Defendants (though Reagan's active assistance may have ceased with his April 13, 2001 termination of employment) deliberately defeated the restructuring that would have enabled QoS to survive and prosper. Said Defendants wrongfully obstructed said Rights Offering, knowing that, in doing so, they would destroy the company.

86. The votes at the August 3, 2001 meeting against the rights offering, and the refusal to engage in any meaningful negotiations with respect thereto, breached the fiduciary duties owed by those Defendants, thereby causing the loss of all or substantially all the salvageable value of QoS. At that time, with the commitment of $10,000,000 through the Rights Offering (had it not been defeated by the improper actions of Defendants), the enterprise value of QoS was approximately $50,000,000.

87. As a result of such breaches of fiduciary duty, and the extraordinary bad faith on the part of Defendants, the Plaintiff has been damaged in the amount of $150,000,000 or such other amount as is shown by appropriate evidence on the trial of this case; and Defendants are jointly and severally liable therefor.

## COUNT III

## QOS CLAIM FOR TORTIOUS INTERFERENCE

88. The allegations of all enumerated paragraphs above are hereby incorporated into this COUNT III as fully and completely as if set out at length herein.

89. The Warburg Defendants and the Warburg Funds misused their control and influence over Italia and Glanville, and wrongfully caused them to breach their fiduciary duties as Directors of QoS.

89. The Warburg Defendants and the Warburg Funds effectively interfered with QoS Management and its property rights by causing Defendants Italia and Glanville to breach their fiduciary duties and abuse their authority.

90. The Warburg Defendants, the Warburg Funds, Italia and Glanville abused and misused their authority and breached their duties so as to direct the business and management of

QoS in a manner calculated to serve the interest of the Warburg Defendants, rather the interest of QoS and its stockholders.

91. As a result of such tortious interference, Plaintiff QoS suffered in the first instance, disruption of its operations, waste of its assets and damage to its business and employee relationships. As a result of this continual interference and disruption, QoS was confronted with insolvency and cessation of business operations.

92. After forcing QoS into impending insolvency, Defendants continued their tortious interference, which included breaches by Defendants Italia and Glanville of their fiduciary duties. Defendants continued their tortious interference by willfully and maliciously obstructing and interfering with the Rights Offering, with the specific intent of preventing QoS from salvaging its business and successfully performing in accordance with its modified business plan, thereby forcing the complete cessation of QoS operations and insolvency. As a result of Defendants' tortious interference, the Plaintiff QoS lost all or substantially all its value as an enterprise, which value was approximately $150,000,000.

93. The tortious interference was primarily instigated through the Warburg Defendants, the Warburg Funds, Glanville and Italia, but with the knowing and willful complicity of Hendrickson and Reagan (who were, essentially, co-conspirators with the other Defendants), with the proximate result being the loss to QoS of all or substantially all its enterprise value of approximately $150,000,000.

94. Plaintiff QoS is entitled to recover from Defendants, jointly and severally, the sum of $150,000,000 or such other sum as is shown by appropriate evidence upon the trial of this case.

COUNT IV

QOS CLAIM FOR FRAUD, CONCEALMENT AND NEGLIGENT MISPREPRESENTATION

95. The allegations of all enumerated paragraphs above are hereby incorporated into this COUNT IV as fully and completely as if set out at length herein.

96. The misrepresentations of the Warburg Defendants, the Warburg Funds, Italia and Glanville, made at the times and places aforesaid and at all additional times, included representations of funding commitments when they knew such representations were false, and when they knew the Warburg Defendants and the Warburg Funds had no intention of funding QoS as promised.

97. Defendants, in violation of their fiduciary duties, failed to disclose the communications between and among themselves regarding the intent to remove Valentine, O'Neill and Keane from active management of QoS, and to supplant Valentine with Hendrickson. These communications were material, and the failure to timely and properly disclose same, and the substance thereof, caused serious disruptions in the management and operations of QoS, as well as its efforts to obtain funding; it also caused the company to make significant outlays of valuable resources and capital it would have otherwise not made.

98. Contemporaneously with such misrepresentations of funding and concealment of secret plans of a "management coup," the Warburg Defendants and the Warburg Funds also

engaged in secret discussions with others for the possible exploitation of QoS business assets by persons or entities other than QoS.

99. As a part of this illicit scheme to defraud, Defendants intentionally created an environment of business disruption so as to place QoS in a position of extreme duress.

100. Included in the misrepresentations of fact by the Warburg Defendants, the Warburg Funds, Italia and Glanville was the representation that if Valentine, O'Neill and Keane resigned their positions as executive officers of QoS, the Warburg Defendants and the Warburg Funds would provide additional funding to QoS as outlined in proposals theretofore approved by Warburg. At the time the Warburg Defendants, Italia and Glanville made these promises of funding, they knew that the Warburg Defendants and the Warburg Funds had no intention of providing such funding. Their real goal was simply to remove Messrs. Valentine, O'Neill and Keane from management, so that the Warburg Defendants, the Warburg Funds, Italia and Glanville, with the help of Hendrickson and Reagan, could easily manipulate QoS and its assets, so as to be readily exploitable by them for their own benefit. Had, for example, Warburg disclosed in or about January 2001 its known intention not to fund the company--or even the possibility of such an intention--QoS would have significantly curtailed is capital expenditures; instead, in reliance on defendants' misrepresentations and/or failures to disclose its intentions regarding funding, QoS continued to proceed with the roll-out of the network, profoundly depleting cash reserves it would have otherwise maintained. Consistently with this pattern of deliberate deceit concerning its intentions to fund the company, Glanville on or about March 6, 2001, opined in an e-mail to Wachovia Bank, with which QoS was negotiating for funding in exchange for certain equity warrants, that QoS was fiscally and otherwise healthy and would be worth between $400-600 million dollars at an initial public offering that would likely take place

in mid-2002. QoS, which was effectively a party to this representation, reasonably and detrimentally relied on it in its aforementioned decisions, including but not limited to its capital expenditures. In fact, the representations were demonstrably false—knowingly so—when made, as e-mails to and from Glanville and other Warburg personnel shortly thereafter referred to a need to "be careful given what we are about to do," showing that they were already conspiring to oust the board and withhold further funding. Similarly, on or about March 25, 2001 Glanville sent QoS personnel an e-mail warmly congratulating them on the favorable progress the company was making, when Warburg was already planning the April, 2001 coup d'etat.

101. Also included in the misrepresentations by the Warburg Defendants, the Warburg Funds, Italia and Glanville was the specification of a "proof of concept" and the representation that if it were achieved, Warburg would provide additional funding. At the time this representation was made, Warburg, Italia and Glanville knew that it was false, and knew that Warburg had no intention of providing the funding as committed even if the proof of concept was achieved. Said "proof of concept" was nothing more than a diversionary tactic in furtherance of Defendants' fraudulent scheme. The Defendants intended to obstruct all QoS efforts to achieve "proof of concept," and actively attempted to do so.

102. In reliance upon the representations of said Defendants, QoS management revised its priorities and business plan to accomplish the proof of concept, and, in fact did accomplish said proof of concept within a few months of its first delineation by Defendant Glanville despite Defendants' efforts to prevent such accomplishment. Notwithstanding this fact, the Warburg Defendants, the Warburg Funds not only declined to provide the funding, but obstructed the successful efforts of QoS to obtain other financing commitments.

103. As a result of such fraud, deceit and duress, the Plaintiff QoS lost all or substantially all the value of its enterprise, which at that time was approximately $150,000,000 in April 2001, when Warburg first announced that the Warburg Defendants, the Warburg Funds were reneging on their funding commitment, and approximately $50,000,000 in its restructured state when Defendants wrongfully defeated the Rights Offering in August 2001.

104. While Hendrickson and Reagan may not have known the full breadth of the Warburg Defendants, the Warburg Funds, Italia and Glanville scheme to defraud QoS of its enterprise value, they knowingly and willfully participated in same by aiding and abetting certain of the disruptive actions, by concealing material facts and by misrepresenting the status and nature of certain assets and contracts of QoS.

105. The fraud, deceit and duress imposed by Defendants was calculated to remove the dissenting voice of loyal management of QoS, and thereby facilitate Defendants' efforts to misappropriate and improperly exploit the QoS assets and business plan for their own benefit, rather than for the benefit of QoS.

106. As a direct and proximate result of Defendants' fraudulent and intentionally tortious conduct, the Plaintiff QoS has suffered the loss of all or substantially all its enterprise value, which was approximately $150,000,000.

107. The Plaintiff QoS is entitled to recover from Defendants, jointly and severally, the sum of $150,000,000 or such other amount as is shown by appropriate evidence upon the trial of this case.

COUNT V

O'NEILL'S, VALENTINE'S, AND KEANE'S CLAIM FOR FRAUD AND CONCEALMENT

108. The allegations of all enumerated paragraphs above are hereby incorporated into this COUNT IV as fully and completely as if set out at length herein.

109. Plaintiff Valentine was, in addition to owning approximately 2.5 % of the ordinary and preferred shares and subordinated loan notes of QoS, a member of the Board of Directors and the Chief Executive Officer and President of QoS. In addition to investing $ 750,000 of his own money in QoS and receiving the equivalent amount in shares of stock (common and preferred) and loan notes, Plaintiff Valentine executed a contract with the Warburg Defendants in which he represented that he borrowed $ 500,000 solely for the purchase and payment of additional shares of stock (common and preferred) and loan notes in QoS.

110. Plaintiff O'Neill was, in addition to owning approximately 2 % of the ordinary and preferred shares and subordinated loan notes of QoS, a member of the Board of Directors in QoS and its Chairman of the Board of Directors. Plaintiff O'Neill executed a contract with the Warburg Defendants in which he represented that he borrowed $1,000,000 solely for the purchase and payment of shares of stock (common and preferred) and loan notes in QoS.

111. Plaintiff Keane was, in addition to owning approximately 2.5 % of the ordinary and preferred shares and subordinated loan notes of QoS, a member of the Board of Directors in the company and its Chief Financial Officer. In addition to investing $ 750,000 of his own money in QoS and receiving the equivalent amount in shares of stock (common and preferred) and loan notes, Plaintiff Keane executed a contract with the Warburg Defendants in which he represented that he borrowed $ 500,000 solely for the purchase and payment of additional shares of stock (common and preferred) and loan notes in QoS

112. O'Neill, Valentine and Keane made said investments, along with enormous personal investments of time and labor, and incurred liability for the above amounts borrowed, based on express and knowing misrepresentations by the defendants that defendants would adequately fund QoS, and that they were committed to doing so. Indeed, plaintiff Valentine specifically inquired of the defendants why it was necessary for the loan terms to include personal recourse to the borrowers when same were secured by company stock, and was specifically advised that Warburg had no intention of ever enforcing them against the individual borrowers, given their commitment to the company of which defendants were controlling shareholders. All such representations were knowingly false when made and reasonably relied upon to the detriment of said plaintiffs, who have been damaged in the amount of said investments and liabilities, together with such other damages as are shown by the evidence and allowed by law.

COUNT V

PLAINTIFFS' CLAIMS FOR LITIGATION EXPENSES

113. The allegations of all enumerated paragraphs above are hereby incorporated into this COUNT V as fully and completely as if set out at length herein.

114. Defendants have been guilty of intentionally tortious conduct, have acted in bad faith, have been stubbornly litigious and have caused Plaintiffs unnecessary trouble and expense.

115. As a result, Plaintiffs are entitled to recover their respective expenses of litigation, including a reasonable sum as attorney's fees, in such amount or amounts as are shown by

appropriate evidence upon the trial of this case. Plaintiffs are entitled to judgment against Defendants, jointly and severally, for such fees and expenses.

COUNT VIII

PUNITIVE DAMAGES

116. The allegations of all enumerated paragraphs above are hereby incorporated into this COUNT VIII as fully and completely as if set out at length herein.

117. Defendants have acted with malice, a conscious disregard for the rights of Plaintiffs and others, a willful and conscious indifference, and with the specific intent to harm Plaintiffs.

118. As a result of such egregious and intentionally tortious conduct, Plaintiffs are entitled to recover punitive damages against each Defendant in such amount or amounts as are sufficient to deter such wrongful conduct in the future.

119. Plaintiffs demand a trial by jury on this and all causes of action.

WHEREFORE, Plaintiffs respectfully demand judgment against the defendants and in their favor for jointly and severally, compensatory damages sum of ONE HUNDRED FIFTY MILLION DOLLARS ($150,000,000) and such other amounts as are shown by appropriate evidence upon the trial of this case, together with punitive damages in an amount to be determined by the court, their attorneys' fees as aforesaid, and such other relief as the Court deems just, proper and equitable.

Dated: New York, New York
April 4, 2007

_____________/s/________________

WILLIAM A. THOMAS (WT 0116)
Attorney for Plaintiffs
89 Fifth Avenue, Suite 900
New York, New York 10003
(212) 741-8900